**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

SHIRLEY BABCOCK,[1]

                                    Plaintiff,                    5:17-cv-00580 (BKS)

v.

NANCY A. BERRYHILL, Acting Commissioner of Social
Security,
                                    Defendant.

**Appearances:**

*For Plaintiff:*
Howard D. Olinsky
Olinsky Law Group
One Park Place
300 South State Street, Suite 420
Syracuse, NY 13202

*For Defendant:*
Grant C. Jaquith, United States Attorney
Johanny Santana, Special Assistant United States Attorney
Social Security Administration
Office of Regional General Counsel
26 Federal Plaza, Room 3904
New York, NY 10278

**Hon. Brenda K. Sannes, United States District Judge:**

**MEMORANDUM-DECISION AND ORDER**

## I.      INTRODUCTION

          Frederick Babcock, Jr. (the "claimant") filed this action under 42 U.S.C. §§ 405(g) and

1383(c)(3), seeking review of a decision by the Acting Commissioner of Social Security denying

his application for Supplemental Security Income ("SSI") benefits and Disability Insurance

---

[1] On January 22, 2018, counsel for Plaintiff, Frederick Babcock, Jr., filed a statement noting the death of Mr. Babcock. (Dkt. No. 14). On January 30, 2018, counsel for Plaintiff filed a motion to substitute Mr. Babcock's mother, Shirley Babcock, as party Plaintiff. (Dkt. No. 15). On March 8, 2018, United States Magistrate Judge Daniel J. Stewart entered a text order substituting Shirley Babcock as the named Plaintiff in this matter. (Dkt. No. 22).

Benefits ("DIB"). (Dkt. No. 1). The claimant passed away while this action was pending and his mother, Shirley Babcock, was substituted as Plaintiff. (*See supra* note 1). As Plaintiff acknowledged, the claimant's SSI claim was extinguished upon his death.[2] (Dkt. No. 15-1, ¶ 1). Thus, the Court only reviews the DIB claim for the time period May 15, 2010 (the alleged disability onset date) to December 31, 2013 (date last insured). 42 U.S.C. § 423(a)(1)(A), (c)(1), (d); 20 C.F.R. § 404.131. The parties' briefs, filed in accordance with N.D.N.Y. General Order 18, are presently before the Court. (Dkt. Nos. 9, 17). After carefully reviewing the Administrative Record (Dkt. No. 8) and considering the parties' arguments, the Court affirms the decision of the Commissioner.

## II.     BACKGROUND

### A.     Procedural History

On November 19, 2013, the claimant filed an application for disability benefits, with an onset date of May 15, 2010. (R. 17). The claimant based his claim on "injury to right leg, collar bone injury, bulging disks in back, herniated discs in back, history of heart attack, heart problems and COPD." (R. 76). The claimant's application was denied on March 21, 2014. (R. 17). The claimant requested a hearing before an Administrative Law Judge ("ALJ"), which was held on September 3, 2015 before ALJ F. Patrick Flanagan. (R. 34–73). On October 29, 2015, ALJ Flanagan issued a decision finding that the claimant was not disabled within the meaning of the Social Security Act. (R. 17–28). The Appeals Council denied the claimant's request for review of the ALJ's decision on April 5, 2017. (R. 1–6). On May 24, 2017, the claimant commenced this action. (Dkt. No. 1).

---

[2] Under 42 U.S.C. § 1383(b)(1)(A)(i) or (ii), an SSI adjustment or recovery may be paid only to a deceased claimant's surviving spouse or parent with whom the "disabled . . .child . . . was living . . . at the time of his death."

### B.      Claimant's Background and Testimony

The claimant was 53 at the time of the hearing and was a high school graduate. (R. 40–42). He worked full time as a janitor until 2008, when his position was downsized. (R. 203). He claimed that he was unable to work due to disability as of May 15, 2010. (R. 76).

The claimant testified that he lived alone, did not have a driver's license, and was able to walk to the post office, which was an eighth of a mile from his residence (a one-room efficiency apartment), for his mail. (R. 41, 55). He talked to his mother on the phone daily. (R. 42).

In August 2013, Mr. Babcock had a heart attack. (R. 46). A few months later, a defibrillator was implanted. (R. 50). Stents were also put in. (R. 50). The claimant continued, however, to experience chest pain, which included tightness in his chest, as well as difficulty breathing and sweating. (R. 50–51). He wore a nitroglycerin patch "12 hours on and 12 hours off every day." (R. 53). He also took nitroglycerin pills when needed, approximately every few weeks. (R. 52). At the hearing, the claimant described a recent angina attack that sent him to the emergency room. (R. 62). He stated that "it felt like somebody . . . grabbed a hold of [his] chest and squeezed," that it was hard for him to breathe, and that he was sweating. (R. 62). The claimant testified that he experienced chest pain even without exertion—when sitting and watching TV, for example. (R. 51). The claimant testified that he suffered from dizziness or vertigo but that he did not know whether it was related to his heart. (R. 48–49).

He stated that he also had a back injury that had bothered him "for years." (R. 46). He received injections for his back pain. (R. 46–47). He stated that even if he did not have a heart condition, his back condition would have kept him from working. (R. 47–48). The claimant testified that he could not do his prior work as a janitor and stated that he could not, for example, pick up a "5-gallon bucket full of water." (R. 48).

The claimant testified that he had breathing problems and suffered from chronic obstructive pulmonary disease ("COPD"). (R. 51). The claimant quit smoking six months before the hearing. (R. 51).

On a typical day, the claimant would make breakfast (scrambled eggs, coffee, and toast) and lunch ("a can of soup and a sandwich"), and in the mornings he might "visit with a friend," but otherwise he did nothing. (R. 54). He stated that he did not have help taking care of his apartment, which was "just one room" and there was "not much to be done." (R. 55). The claimant stated that he did his laundry in the sink as he did not have laundry facilities. (R. 55). He stated that he watched TV but did not have a computer. (R. 56). The claimant testified that he would "lay down on the bed" when he watched TV "because of [his] back." (R. 59–60). The claimant stated that he suffered side effects from his medications, which made him feel "weird," "loopy," and "sleepy," and that he usually took a nap in the afternoon. (R. 58).

At the grocery store, the claimant would use a handicap cart if his back was bothering him. (R. 59). The claimant testified that he mowed the lawn "maybe five times" during the summer, but tried not do it regularly, and that he did not do any snow shoveling. (R. 53–54).

Linda Voss, a certified rehabilitation counselor and vocational expert, also testified at the hearing. (R. 66). Voss stated that an individual with past work experience as a janitor—and who: "could lift and carry 20 pounds occasionally and 10 pounds frequently"; "could stand and walk six hours total in an eight-hour work day and sit about six hours total in an eight-hour work day"; "could do occasional stooping, balancing, kneeling, crouching, and crawling"; "should avoid concentrated exposure to fumes"; "should not work at heights or around dangerous machinery"; and could "understand, remember only simple instructions and . . . carry out simple tasks"— could perform light work. (R. 68). Voss further testified that even if that individual had "an

4

additional restriction" and could "do occasional reaching bilaterally," there would still be other light, unskilled work that individual could perform. (R. 69). Voss stated that if the hypothetical individual could only rarely perform tasks that involved reaching, there would be no jobs available. (R. 70).

### C. Medical Evidence

Although there is a treatment note from September 2010 concerning a hand injury (R. 348–49), the remainder of the claimant's medical records are dated on or after January 2013.

#### 1. Hospitals

##### a. Carthage Area Hospital

The claimant was admitted to Carthage Area Hospital ("CAH") on January 9, 2013 for "marked dizziness and vertigo." (R. 350). The claimant also had pneumonia, "[u]ncontrolled hypertension," and COPD. (R. 350). The claimant underwent a CT scan and MRI of the brain, which were negative except for "cerebellar tonsillar ectopia." (R. 350). The claimant had an MRI of the cervical spine and a chest x-ray, both of which were negative. (R. 350). An EKG showed "regular sinus rhythm." (R. 350). During his hospitalization, the claimant was treated with, among other things, antibiotics and blood pressure medication, and "improved quite a bit." (R. 350). He was discharged on January 16, 2013. (R. 350).

On August 3, 2013, the claimant went to the CAH emergency room reporting chest pain and discomfort. (R. 440). It was determined that he was having a myocardial infarction, and CAH transferred him to the St. Elizabeth Medical Center for treatment. (R. 447).

On August 16, 2013, the claimant went to the emergency room at CAH, reporting chest pain. (R. 454). He was admitted to the CAH, and on August 19, 2013, the claimant was transferred to the St. Elizabeth Medical Center for a coronary angiogram. (R. 453).

On August 28, 2013, the claimant went to the CAH emergency room for "tightness in the chest." (R. 469). The claimant was examined and discharged in "improved" and "stable" condition. (R. 470). On September 2, 2013, the claimant went back to the CAH emergency room on September 2, 2013 for an issue with his defibrillator. (R. 483).

On August 8, 2014, the claimant went to the CAH emergency room with complaints of chest pain; he was given morphine and Tylenol and discharged. (R. 823). On August 10, 2014, the claimant went to the CAH emergency room with complaints of dizziness. (R. 814). He was given Antivert for dizziness and discharged following an EKG and blood work. (R. 815, 819).

### b.     St. Elizabeth Medical Center

On August 3, 2013, the claimant was treated at St. Elizabeth Medical Center for a myocardial infarction. (R. 325). He underwent a catheterization and "was found to have a totally occluded right coronary artery with weak left-to-right collaterals, which was treated with angioplasty and stenting." (R. 316, 320). The claimant "arrested" during the angioplasty procedure, "which required defibrillation." (R. 325). He was discharged on August 8, 2013. (R. 319). The claimant's diagnoses on discharge were myocardial infarction, coronary artery disease, and reflux disease (R. 320). He was instructed not to drive for three days, and it was recommended that his activity be "limited" for one month. (R. 547).

On August 19, 2013, the claimant was transferred from CAH to the St. Elizabeth Medical Center, where he underwent a cardiac catheterization; the catheterization showed that "he had a patent [or open] stent." (R. 453, 304–06). He was discharged on August 21, 2013. (R. 304).

On October 11, 2013, the claimant was admitted to the St. Elizabeth Medical Center for placement of an implantable cardioverter defibrillator for "ischemic cardiomyopathy." (R. 286–87). The claimant's discharge instructions included "[n]o lifting, pushing, or pulling greater than 5 pounds for 2 weeks" and "[n]o arms overhead or behind back for 2 weeks." (R. 287).

On June 7, 2014, the claimant went to the CAH emergency room because he was not feeling well. (R. 721). He was sent to St. Joseph's Hospital. (R. 721).

On April 7, 2015, the claimant was admitted to CAH for chest pain. (R. 919). On April 8, 2015, the claimant was transferred to St. Elizabeth's Medical Center, where he underwent a cardiac catheterization. (R. 919, 922). On April 20, 2015, the claimant was admitted at the St. Elizabeth Medical Center for chest pain, and he underwent cardiac catheterization, which "revealed noncritical coronary artery disease." (R. 835). "Chest pain, noncardiac, most probably musculoskeletal." (R. 835). The claimant was discharged on April 22, 2015. (R. 835).

The claimant was again admitted on July 26, 2015 for chest pain. (R. 874). He underwent a cardiac catheterization on July 29, 2015, which revealed a "[w]idely patent stent in the proximal RCA," "mild disease elsewhere in the RCA, and an "[e]ssentially normal left coronary system with mild disease." (R. 881). He was discharged on July 30, 2015 with a diagnosis of "chest pain, noncardiac." (R. 874).

### c. St. Joseph's Hospital

On June 7, 2014, the claimant was admitted to St. Joseph's Hospital for bradycardia (slow heart rate) and chest pain. (R. 721). He was seen by Diwaker Lingam, M.D., who examined him and reported normal findings. (R. 727; *see* R. 722 (reporting "Heart: regular S1, S2, no murmurs," "Back: symmetric, no curvature. ROM normal")). On June 10, 2014, the claimant underwent a cardiac catheterization. (R. 724)). According to the report, there were "[p]atent stents to [right coronary artery ("RCA")] and non-hemodynamically significant disease in the distal RCA" and "moderate disease in a small diagonal." (R. 725). The principal diagnosis was bradycardia, along with chest pain, coronary artery disease, and hypertension. (R. 726). The claimant was discharged on June 11, 2014. (R. 726).

### d.  Samaritan Medical Center

On July 21, 2014, the claimant went to the Samaritan Medical Center emergency department complaining of chest pain. (R. 935–36). Chest x-rays showed no cardiomegaly "but some pulmonary venous hypertension." (R. 936). The claimant went back to the Samaritan Medical Center emergency department on August 4, 2014 complaining of chest pain. (R. 938). Chest x-rays revealed no "acute cardiopulmonary process or focal consolidation." (R. 939).

### 2.  Medical Office Visits

### a.  CAH Medical Center – Nurse Practitioner Christopher Grudowski and Physician Assistant Susan Swatsworth

It appears from the record that from January 25, 2013 to July 20, 2015, Nurse Practitioner Christopher Grudowski and Physician Assistant Susan Swatsworth at CAH Medical Center were the claimant's primary care providers.

The claimant saw NP Grudowski on January 25, 2013, to follow up his previous hospitalization for dizziness and vertigo. (R. 373, 352). On physical examination of the claimant's chest and lungs, NP Grudowski noted that "[b]reath sounds are decreased" and that there was "a slight prolonged and expiratory phase." (R. 374). The claimant had a full range of motion "of all major joints" on neurological examination. (R. 374). NP Grudowski diagnosed hypertension, gastroesophageal reflux disease, and mild chronic pulmonary disease. (R. 373).

The claimant saw NP Grudowski again on February 5, 2013 for "[f]ollow-up of hypertension." (T. 382). NP Grudowski noted that the claimant's "[b]reath sounds [were] clear" and that he had full range of motion in his extremities. (R. 382). NP Grudowski refilled the claimant's blood pressure and GERD medication. (R. 382).

The claimant saw NP Grudowski on April 3, 2013 for "his regular follow-up." (R. 384). NP Grudowski noted that the claimant had hypertension but had stopped taking his blood

pressure medication because it was "making him feel wrung out." (R. 384). The claimant complained of lower back pain and stated that he injured his back at age 18. (R. 384). NP Grudowski counseled the claimant "on the importance of medication compliance" for his hypertension, but the claimant stated he did not want to take it, and referred claimant to physical therapy for further evaluation of the back pain and prescribed meloxicam. (R. 385).

On April 15, 2013, the claimant saw PA Susan Swatsworth. (R. 386). He complained that his back pain, which he had had since 1983, when he "slipped on railroad ties and fell in ditch onto the rails," was getting worse (R. 386). The claimant reported "difficulty getting out of bed," "spasms, sharp pains . . . along his spine," "numbness from his back to his knees, paresthesias down to his feet, sometimes his legs will buckle & give way, he has to stand slowly, grab onto things his back will crack & pop." (R. 386). PA Swatsworth ordered x-rays to be followed by an MRI,[3] continued meloxicam and prescribed capsaicin cream, and a medication for claimant's blood pressure.[4] (R. 388).

On May 16, 2013, the claimant returned to see PA Swatsworth regarding his back pain. (R. 435). PA Swatsworth prescribed a muscle relaxant and increased the "dose of mobic," an anti-inflammatory. (R. 436).

The claimant saw NP Grudowski on May 30, 2013 for "[f]ollow-up of hypertension." (R. 602). At the time, the claimant stated that he felt "well and has no other complaints." (R. 602).

On or about June 10, 2013, PA Swatsworth referred the claimant for pain management at Pain Solutions of Northern New York. (R. 563).

---

[3] The claimant had x-rays on April 15, 2013, which revealed degenerative disc changes throughout the lumbar spine . . . and . . . some facet arthritis" and "[l]imited range of motion with no instability." (R. 394). An MRI report, dated May 10, 2013, identified "diffuse disc bulges at the L2-3 through L4-5 levels" and "diffuse disc bulge and small central disc protrusion at the L5-S1 level." (R. 268).

[4] Plaintiff went to physical therapy for lower back pain multiple times from April 17, 2013 to June 12, 2013. (R. 395–434).

On July 11, 2013, the claimant saw PA Swatsworth to discuss Dr. Bolla's pain management recommendations for his back. (R. 437). PA Swatsworth noted that the claimant had "some unsteadiness getting up & down from chair, table." (R. 438). PA Swatsworth recommended that the claimant undergo the injection series and that she "felt [it was the] best option at present." (R. 438).

On August 15, 2013, the claimant saw PA Swatsworth for the first time following his myocardial infarction. (R. 451). PA Swatsworth found nothing remarkable on physical examination. (*See* R. 452 (noting that "patient is conscious, alert & orient." and had no "cyanosis, clubbing or edema" of the extremities," and that "distal pulses [were] present")). PA Swatsworth noted that the claimant's lower back pain had improved following the steroid injection and planned to follow up in three months with labs. (R. 452).

The claimant saw PA Swatsworth on September 3, 2013, regarding an issue with his defibrillator. (R. 489). PA Swatsworth noted that the claimant had chest pain, shortness of breath, and tightness. (R. 490). She further noted that there was "no pain elicited on strai[ght] leg raise bilaterally." (R. 490).

On December 3, 2013, the claimant saw PA Swatsworth and reported that he had recently had an "episode of palpations." (R. 511). PA Swatsworth's findings on physical examination were benign. (R. 511).

On April 21, 2014, the claimant saw PA Swatsworth "for ER follow-up(s) at CAH." (R. 623). The claimant complained of headaches, dizziness, lightheadedness, "blackedout vision," and occasional chest pain. (R. 623). PA Swatsworth noted that the claimant was scheduled for a nuclear stress test. (R. 623).

The claimant saw PA Swatsworth on May 6, 2014, and reported that he had "not had any further difficulty with syncope or lightheadedness. (R. 626). PA Swatsworth noted that several CT scans were pending scheduling and that she would see the claimant again after the CT scans were complete. (R. 627). PA Swatsworth saw the claimant on May 20, 2014, May 28, 2014, and June 16, 2014. (R. 629–36).

On July 30, 2014, the claimant complained to PA Swatsworth of intermittent chest pain and requesting a refill of hydrocodone (which he initially received in the emergency room) for pain as the nitroglycerin did not "relieve the pain." (R. 637). PA Swatsworth prescribed acetaminophen. (R. 637). He again saw PA Swatsworth on August 28, 2014, (R. 640), September 17, 2014, (R. 643), and September 24, 2014, (R. 646). When the claimant saw PA Swatsworth on November 24, 2014, he complained that he was "still hurting in his back, worse," and indicated that he was being seen at the pain center. (R. 768). He reported intermittent chest pain but that he had not needed nitroglycerin. (R. 768). On March 19, 2015, the claimant reported to PA Swatsworth that he was in "constant pain, goes to pain center to these issues." (R. 771).

On May 12, 2015, the claimant saw PA Swatsworth to follow up after being hospitalized at St. Elizabeth's Medical Center, where he was kept overnight for observation after suffering chest pain. (R. 774). The claimant followed up with PA Swatsworth on July 20, 2015, after being admitted to the hospital for chest pain on June 18, 2015.

### b. Pain Solutions of Northern New York – Bhupinder Bolla, M.D.

On July 1, 2013, the claimant went for an initial evaluation with Dr. Bhupinder Bolla. (R. 276). He complained of lower back pain ranging from 6/10 to 10/10 and stated that "the onset of the pain began more than 20 years ago" and had "no precipitating event." (R. 276). The claimant indicated that the pain prevented him from taking part in social and recreational activities. (R.

276). He denied having cardiovascular symptoms. (R. 277). On examination, Dr. Bolla found the claimant's range of motion was within normal limits for his neck, back, and upper and lower extremities. (R. 278). Dr. Bolla noted "pain with lumbar spine extension and lateral rotation to the right . . . and left, pain to palpation over the right [and left] facet joints." (R. 278). Dr. Bolla diagnosed "lumbar radiculitis" and "displcmt lumbar intervert disc w/o myelopathy," and proposed a "lumbar epidural steroid injection series," which the claimant indicated he would consider. (R. 278).

On July 18, 2013, Dr. Bolla gave the claimant an epidural steroid injection at L5/S1 to treat "low back pain with radiation to the bilateral buttocks and left lower extremity," which had not resolved with previous conservative treatment. (R. 274).

On August 13, 2013, the claimant reported to Dr. Bolla that he had "aching, intermittent" lower back pain, which he rated as "3/10." (R. 270). The claimant complained that he experienced "tingling, fatigue, difficulty sleeping associated with the pain," and that it was "alleviated by doing nothing, lying down." (R. 270). He also reported that he "got 100% relief for 2 weeks after the injection," and that though it was "now intermittent," it was not "constant like it used to be" and "50% better." (R. 270). The claimant denied having any cardiovascular symptoms. (R. 271). Dr. Bolla indicated that the claimant's range of motion for his upper and lower extremities was within normal limits. (R. 271). Dr. Bolla noted that the claimant should "follow up only as needed" but that the "stent placement" and blood thinner medication precluded "any interventional management." (R. 272).

### c.      Central New York Cardiology – Thor Markwood, M.D.

On September 24, 2013, the claimant saw Thor Markwood, M.D., at Central New York Cardiology. The claimant reported that he was feeling well and denied "any cardiac symptoms." (R. 289). Dr. Markwood recorded the claimant's medical history as hypertension, "[a]cute MI

with cardiac arrest at the time of angioplasty, mild cardiomyopathy, nonsustained ventricular tachycardia, and COPD. (R. 289–90). Dr. Markwood noted that because the claimant's cardiomyopathy appeared "to be old" and unlikely to improve, he was a candidate for defibrillator insertion. (R. 292).

### d. Samaritan Medical Center Pain Clinic – Nurse Practitioner Melissa Saxton

On September 8, 2014, the claimant saw Nurse Practitioner Melissa Saxton at the Samaritan Medical Center Pain Clinic for "noncardiac chest pain" on the referral of Dr. Slezka. (R. 940). He described "pain in his chest and sternal pain that range[d] anywhere from tightness to feeling like his chest [was] being ripped open" and stated that stress, increases in activity, and being out in the sun increased his pain. (R. 940). The claimant reported only tramadol and morphine seemed to help. (R. 940). He also stated that he had back pain and that he occasionally experienced "a vice-like sensation of pain running around his ribs bilaterally into his chest" that NP Saxton noted was "suggestive of radiculopathy." (R. 941). NP Saxton examined the claimant and noted that he was "on and off the table easily" and had upright posture and a nonantalgic gate. (R. 942). His "[m]uscle strength in the upper and lower extremities [was] 5/5." (R. 942). NP Saxton found that "[p]alpation of the thoracic spine . . . reproduce[d] some chest pain per the patient," as did palpation of the sternal wall and "[d]eep breathing with pushing on the chest." (R. 942). NP Saxton assessed "1. Chest pain, noncardiac in origin. 2. Possible costochondritis. 3. Possible thoracic radiculopathy. 4. Intercostal neuralgia." (R. 943). NP Saxton planned to speak with Dr. Slezka about the claimant's noncardiac chest pain, send the claimant for a CT scan of his thoracic spine,[5] and to consider whether thoracic epidural injections were indicated. (R. 943).

---

[5] The scan revealed "[m]ild multilevel degenerative disc disease" and a "small left paracentral disc protrusion." (R. 945).

NP Saxton prescribed neuropathic medication (gabapentin) and noted that she was "not comfortable putting the patient on long-term narcotics for this kind of pain, especially when he states the only thing that seems to work for him is morphine." (R. 944).

NP Saxton saw the claimant on October 20, 2014, and reported his pain was "8–9/10." (R. 947). NP Saxton noted that the claimant had been taking gabapentin for two months and that he was not "sure" that his pain was better. (R. 947). On neuromuscular examination, NP Saxton found that palpation "of the T6-T7 region in the spinous process inbetween the disc space does cause intercostal neuralgia and has pain run around his chest and into the center of his sternum." (R. 947). She also noted "[t]ight fibrous muscle banding is appreciated in this region as well." (R. 947). NP Saxton again noted that the claimant would benefit from a thoracic epidural but that she needed to speak to Dr. Montalvo because he was on a blood thinner. (R. 948). NP Saxton saw the claimant on December 3, 2014, (R. 950), January 15, 2015, (R. 952), March 20, 2015, (R. 954), May 6, 2015, (R. 956), May 15, 2015, (R. 959), June 15, 2015, (R. 961), June 30, 2015 (R. 966), and August 4, 2015 (R. 968), treating his chest and thoracic pain with tramadol, neuropathic medications, and trigger point injections.

### D. Opinion Evidence[6]

#### 1. Consultative Examiner – Elke Lorensen, M.D.

On March 14, 2014, at the Commissioner's request, the claimant underwent an internal medicine examination by Elke Lorensen, M.D. (R. 589). The claimant told Dr. Lorensen that: he had a heart attack in 2013, cardiac catheterization, angioplasty, and stent placement; he experienced "occasional chest pain" and the last episode was the month before; and he took nitroglycerin. (R. 589). The claimant reported that he had been to the emergency room for chest

---

[6] The record also contains a comprehensive psychological evaluation by Stephen Fitzgerald Ph.D. (R. 931–34). As there are no issues before the Court concerning the claimant's mental capacity, the Court does not summarize the opinion here.

pain and fatigue a "few times" since the heart attack and that he "gets tired after doing absolutely anything." (R. 589).

The claimant indicated that he had "had back pain since 1985," that it was in his "lower lumbar spine and present most of the time," and that it had "worsened in severity." (R. 589). He said that the back pain "is made worse with bending, standing, and walking too far," but that it did "not radiate into the extremities" and was not "accompanied by any numbness or parestheisas." (R. 589). He had "no special treatment for the problem." (R. 589).

The claimant also complained of COPD, for which he used inhalers. (R. 589). Exertion was an aggravating factor. (R. 589).

Dr. Lorensen set forth the claimant's activities of daily living as follows: "He cooks when he is hungry, cleans when he needs do [sic], does laundry when he needs to, and shops once a month. He showers once a week and dresses himself daily. He watches TV, listen to the radio, and socializes with friends." (R. 590).

Dr. Lorensen indicated that the claimant "appeared to be in no acute distress," that his gait was normal, and that he was able to change for the exam, "rise from chair," and get on and off the exam table without difficulty or assistance. (R. 590).

Dr. Lorensen performed a musculoskeletal exam and reported that the claimant had "full flexion, extension, lateral flexion bilaterally, and full rotary movement bilaterally." (R. 591). He had lumbar spine flexion to 50 degrees, extension 20 degrees, and lateral flexion and rotation 15 degrees bilaterally. (R. 591). Dr. Lorensen indicated that the claimant had full range of motion "of shoulders, elbows, forearms, and wrists bilaterally." (R. 591). Dr. Lorensen further found that Claimant's strength was "5/5 in the upper and lower extremities," his "[h]and and finger

dexterity" was intact, and his "[g]rip strength was 5/5 bilaterally." (R. 592). Dr. Lorensen diagnosed:

1.      Coronary artery disease, status post myocardial infarction, status post angioplasty and stents.

2.      Cardiac arrhythmia, status post pacemaker insertion, presumably converted to sinus rhythm.

3.      Chronic obstructive pulmonary disease.

4.      Back pain.

(R. 592). Dr. Lorensen issued the following "Medical Source Statement": "There are no gross limitations sitting, standing, walking, or handling small objects with the hands. There are moderate-to-marked restrictions bending, lifting, and reaching. The claimant should avoid smoke, dust, and other respiratory irritants." (R. 592).

**2.      Vojtech Slezka, M.D.**

On September 1, 2015, Vojtech Slezka, M.D., of the New York Heart Center, completed a medical source statement. Dr. Slezka indicated he had treated the claimant since June 2014 with "variable frequency." (R. 927). Dr. Slezka's diagnoses included coronary artery disease and ischemic cardiomyopathy. (R. 927). Dr. Slezka indicated that "chronic fatigue was a side effect of the claimant's medication and that he also suffered from chest pain, "exertional intolerance," and shortness of breath, but Dr. Slezka noted that the claimant had "denied chest pain" at his last office visit. (R. 927). When asked to "describe how your patient's impairments may be affected by work-related activities (prolonged sitting or standing/walking, heavy lifting or carrying, repetitive motions, stress, etc.)," Dr. Slezka wrote that "due to reduced LV systolic function (LV EF 40%) patient will unlikely tolerate strenuous exertion." (R. 927). Dr. Slezka opined that the claimant could sit for 30 minutes at one time and stand for five minutes at one time, and that he could sit at least six hours in an eight-hour work day, but could stand or walk for less than two

hours. (R. 928). Dr. Slezka indicated that the claimant could occasionally lift less than 10 pounds, rarely lift 10 to 20 pounds, and never lift 50 pounds. (R. 928). According to Dr. Slezka, the claimant could never twist, stoop, or crouch, and could "rarely" reach or climb ladders or stairs. (R. 928–29). Dr. Slezka stated that he believed that given his limitations, the claimant would be off task 20 percent of the time and absent from work more than "four days per month." (R. 929). Dr. Slezka stated that the claimant's "prognosis is not always predictable and patient's condition can improve but also deteriorate with time." (R. 929).

### E.    ALJ's Decision Denying Benefits

On October 29, 2015, ALJ Flanagan issued a decision denying the claimant's claim for disability benefits. (R. 17–28). At step one of the evaluation process,[7] the ALJ determined that the claimant had not engaged in any substantial gainful activity since the alleged onset date, May 15, 2010. (R. 19). At step two, the ALJ determined that, under 20 C.F.R. §§ 404.1520(c) and 416.920(c), the claimant had the following "severe impairments": "coronary artery disease status post inferior wall myocardial infarction with right coronary artery angioplasty and cardiac defibrillator implantation, lumbar spine degenerative disc disease and borderline intellectual functioning." (R. 19).

At step three, the ALJ found that the claimant did not have an impairment or combination of impairments that met or medically equaled the severity of a listed impairment. (R. 20 (citing 20 C.F.R. §§ 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925, and 416.926)).

---

[7] Under the five-step analysis for evaluating disability claims,

> if the Commissioner determines (1) that the claimant is not working, (2) that he has a severe impairment, (3) that the impairment is not one [listed in Appendix 1 of the regulations] that conclusively requires a determination of disability, and (4) that the claimant is not capable of continuing in his prior type of work, the Commissioner must find him disabled if (5) there is not another type of work the claimant can do.

*Burgess v. Astrue*, 537 F.3d 117, 120 (2d Cir. 2008) (alteration in original) (internal quotation marks omitted). "The claimant bears the burden of proving his or her case at steps one through four," while the Commissioner bears the burden at the final step. *Butts v. Barnhart*, 388 F.3d 377, 383 (2d Cir. 2004).

At step four, the ALJ assessed the claimant's residual functional capacity ("RFC")[8] and found that he had the capacity to perform light work as defined in 20 C.F.R. §§ 404.1567(b) and 416.967(b),[9] finding that he

> can lift/carry 20 lbs. occasionally and 10 lbs. frequently, sit for up to 6 hours and stand/walk up to 6 hours, except he should not more than occasionally stoop, balance, kneel, crawl and crouch, and should avoid concentrated exposure to fumes, odors, dust, gas and any other respiratory irritant and should not work at unprotected heights or around dangerous machinery. In addition, he is able to understand and remember simple instructions and can carry out only simple tasks.

(R. 22). In making these findings, the ALJ "considered all symptoms and the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence, based on the requirements of 20 CFR 404.1529 and 416.929 and SSRs 96-4p and 96-7p." (R. 23). The ALJ also stated that he "considered opinion evidence in accordance with the requirements of 20 C.F.R. § 404.1527 and 416.927, as well as SSRs 96-2p, 96-5p, 96-6p, and 06-3p." (R. 23).

In considering the claimant's alleged symptoms, the ALJ followed a two-step process: first, he determined whether there was an "underlying medically determinable physical or

---

[8] The Regulations define residual functional capacity as "the most [a claimant] can still do despite" his limitations. 20 C.F.R. § 404.1545 (a)(1). The ALJ must assess "the nature and extent of [a claimant's] physical limitations and then determine . . . residual functional capacity for work activity on a regular and continuing basis." 20 C.F.R. § 404.1545(b). The Regulations further state that "[a] limited ability to perform certain physical demands of work activity, such as sitting, standing, walking, lifting, carrying, pushing, pulling, or other physical functions (including manipulative or postural functions, such as reaching, handling, stooping or crouching), may reduce your ability to do past work and other work." *Id.*

[9] Light work

> involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities. If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time.

20 C.F.R. § 404.1567(b).

mental" impairment that could reasonably be expected to produce the claimant's pain or other symptoms; and second, after finding such impairments, he evaluated the intensity, persistence, and limited effects of the claimant's symptoms to determine the extent to which they limited the claimant's functioning. (R. 23). Applying this two-step process, the ALJ found that the claimant's "medically determinable impairments could reasonably be expected to cause the alleged symptoms," but that "the claimant's statements concerning the intensity, persistence, and limited effects of these symptoms" were "not entirely credible." (R. 23).

The ALJ found that the evidence did not support a disability onset beginning May 15, 2010, noting that while the claimant allegedly had lower back pain, it "did not prevent him from activities such as shoveling out a snowmobile." (R. 23). He noted that in September 2011, the claimant told Dr. Fitzgerald that he was being treated for acid reflux, "but no other serious health problems."(R. 23). The ALJ further found that although "the claimant sustained a myocardial infarction, the tenor of the evidence suggests that any complaints of chest pain" were noncardiac in nature. (R. 24).

The ALJ gave "little weight" to Dr. Slezka's conclusions that the claimant could not stand or walk "up to 2 hours during the course of an 8-hour workday," would need to be able to shift position at will, could "'rarely hold his head in a static position," could "occasionally look down, look up and turn his head left to right," and "would likely be absent more than four days per month and 'off task' 20% of the workday." (R. 25). The ALJ explained that these conclusions were unsupported in view of Dr. Slezka's "report[] that the claimant's complaints of chest pain are non-cardiac in nature." (R. 25). The ALJ also took issue with Dr. Slezka's "prognosis" that the claimant's "condition" "was not always predictable" and "could improve" or "deteriorate." (R. 26). The ALJ explained that this "vague prognosis" was "of limited value" and

was not supported by the medical evidence in the record. (R. 26). The ALJ further explained that "there is no medically determinable impairment" that would cause limitations in the claimant's ability to move his head, reach, or use his hands, and that there was no medical evidence that would support Dr. Slezka's opinion that the claimant would be "off task" or absent from work at least four days per month. (R. 26).

The ALJ assigned Dr. Lorensen's opinion "some weight since she completed a physical examination and has program knowledge."[10] (R. 26). The ALJ discounted Dr. Lorensen's conclusion that the claimant should avoid reaching because she did not identify a medically determinable impairment that "would impose [this] type of limitation." (R. 26). In addition, the ALJ observed that Dr. Lorensen had found nothing on physical examination that would support a reaching limitation. (*See* R. 26 ("explaining that Dr. Lorensen found, inter alia, that the claimant "had full range of motion in his shoulders, elbows, forearms and wrists bilaterally")).

At step five, having determined the claimant's limitations, the ALJ determined that Plaintiff was unable to perform any of his past relevant work. (R. 26). Next, the ALJ considered whether there were other jobs in significant numbers in the national economy for someone Plaintiff's age, with his education, work experience, and RFC. (R. 27). Based on the testimony of the vocational expert, who identified jobs as a photocopy machine operator, folding machine operator, and assembler, the ALJ concluded that "considering the claimant's age, education, work experience, and residual functional capacity, the claimant was capable of making a successful adjustment to other work that existed in significant numbers in the national economy." (R. 583). The ALJ therefore concluded that the claimant "has not been under a disability, as

---

[10] The ALJ did not indicate what "program knowledge" means.

defined in the Social Security Act, from May 15, 2010, through the date of this decision." (R. 27).

## III.   DISCUSSION

### A.   Standard of Review

In reviewing a final decision by the Commissioner under 42 U.S.C. § 405, the Court does not determine *de novo* whether a claimant is disabled. Rather, the Court must review the administrative record to determine whether "there is substantial evidence, considering the record as a whole, to support the Commissioner's decision and if the correct legal standards have been applied." *Moran v. Astrue*, 569 F.3d 108, 112 (2d Cir. 2009). "Substantial evidence is 'more than a mere scintilla.' It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Brault v. Soc. Sec. Admin. Comm'r*, 683 F.3d 443, 447–48 (2d Cir. 2012) (quoting *Moran*, 569 F.3d at 112). The substantial evidence standard is "very deferential" and the Court can reject the facts that the ALJ found "only if a reasonable factfinder would have to conclude otherwise." *Id.* at 448 (quoting *Warren v. Shalala*, 29 F.3d 1287, 1290 (8th Cir. 1994)).

### B.   Analysis

Plaintiff argues that the RFC is not supported by substantial evidence because: (1) the ALJ failed to weigh the opinion evidence properly; (2) the ALJ failed to account for the claimant's reaching limitations; and (3) the ALJ failed to apply Rule 201.12 of the Medical-Vocational Guidelines. (Dkt. No. 9, at 9–13).

#### 1.   Opinion Evidence

The Commissioner argues that because the claimant's SSI claim was rendered moot by his death, only the DIB claim is at issue, and the relevant time period is therefore the alleged disability onset date, May 15, 2010, to his date last insured, December 31, 2013. (Dkt. No. 17, at

8). Thus, the Commissioner asserts that because Drs. Lorensen and Slezka issued their opinions after the expiration of the claimant's insured status, any error in the ALJ's assessment of their opinions is moot. (Dkt. No. 17, at 9); *see Massey v. Comm'r of Soc. Sec.*, No. 15-cv-744, 2016 WL 4987169,*11, 2016 U.S. Dist. LEXIS 125646, at *32, (S.D. Oh. Sept. 15, 2016) (holding that even if the ALJ had failed to properly assess medical expert's opinion, "any resulting error would be harmless" because the expert's "opinion that plaintiff was unable to perform full-time work relied entirely on plaintiff's condition and medical evidence post-dating the expiration of plaintiff's insured status"). Claimant filed his brief before he passed away; he has not responded to this argument. For the reasons that follow, even assuming the opinions of Drs. Lorensen and Slezka were relevant to the time period at issue, the Court finds no error in the ALJ's decision to assign limited weight to their opinions.

### a.    Treating Physician – Dr. Slezka

Plaintiff argues that the ALJ erred in affording "little weight to the . . . opinion of treating physician Dr. Slezka." (Dkt. No. 9, at 10). According to treating physician rule, "the opinion of a claimant's treating physician as to the nature and severity of the impairment is given 'controlling weight' so long as it 'is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record.'" *Burgess*, 537 F.3d at 128 (quoting 20 C.F.R. § 404.1527(d)(2)). On the other hand, "[g]enerally, the opinion of the treating physician is not afforded controlling weight where . . . the treating physician issued opinions that are not consistent with . . . the opinions of other medical experts, for [g]enuine conflicts in the medical evidence are for the Commissioner to resolve." *Id.* (alteration in original) (internal quotation marks and citation omitted). When the ALJ opts not to give a treating physician's opinion controlling weight, he must provide "good reasons" for doing so. *Id.* at 129 (citing *Snell v. Apfel*, 177 F.3d 128, 133 (2d Cir. 1999)). The

Second Circuit has held that "[i]n order to override the opinion of a treating physician . . . the ALJ must explicitly consider, *inter alia*: (1) the frequency, length, nature, and extent of treatment; (2) the amount of medical evidence supporting the opinion; (3) the consistency of the opinion with the remaining medical evidence; and (4) whether the physician is a specialist." *Selian v. Astrue*, 708 F.3d 409, 418 (2d Cir. 2013); *see also* 20 C.F.R. § 404.1527(c).

The Court finds no error in the ALJ's decision to give little weight to the opinion of Dr. Slezka. Here, the ALJ recounted the claimant's hospitalizations, the treatment the claimant had received from various sources, including the CAH Medical Center, pain clinics, and cardiologists. (R. 23–25). There is, however, almost no evidence in the record concerning Dr. Slezka. One reference to Dr. Slezka is contained in the June 11, 2014 discharge summary from St. Joseph's Hospital, which indicated that the claimant was being referred to Dr. Slezka and would follow up in one to two weeks. (R. 805). The ALJ specifically recounted the only other reference to Dr. Slezka: "A report from the Pain Clinic reflects that the consultation requested on the claimant's behalf was requested by Dr. Slezka for 'noncardiac chest pain.'"[11] (R. 24). Further, as the ALJ explained, there is no clinical or diagnostic support for Dr. Slezka's conclusions that the claimant was "not capable of standing/walking up to 2 hours" in an eight-hour workday and "would only be able to 'rarely' hold his head in a static position and occasionally look down, look up and turn his head left to right." (R. 25). Although there is evidence that the claimant suffered from lower back pain and noncardiac chest pain, none of the medical records indicate that this pain caused any standing or walking limitations or restrictions

---

[11] It appears that Dr. Slezka was in the same office as Dr. Yi Zhang, M.D., who treated the claimant at St. Joseph's Hospital in June 2011. (R. 805). None of the records from the claimant's hospitalization at St. Joseph's Hospital would support a conclusion that the claimant had limitations in walking, standing, or movement of his head and neck. (*See* R. 800 (recounting findings from physical examination: "Back: symmetric, no curvature. ROM normal. No CVA tenderness," "Extremities: No edema," "Head: Normocephalic, without obvious abnormality, a traumatic," "Neck: no adenopathy, no carotid bruit, no JVD, supple, symmetrical, trachea midline and thyroid not enlarged, symmetric, no tenderness/mass/nodules.").

in head and neck movement. For example, Dr. Bolla, who was treating the claimant's back pain, found the claimant's range of motion was within normal limits for his neck, back, and upper and lower extremities. (R. 278). In addition, Dr. Slezka offered no explanation for his conclusion that the claimant "would likely be absent more than four days per month and 'off task' 20% of the workday." (R. 25). He referred to "office notes," but there appears to be just one office note in the record from the New York Heart Center, and it contains little information other than a list of the claimant's medications and diagnoses.[12] (R. 797). Thus, it does not provide support for this conclusion. The Court concludes the ALJ gave good reasons supported by substantial evidence for assigning little weight to Dr. Slezka's opinion.

### b.       Consultative Examiner – Dr. Lorensen

Dr. Lorensen examined the claimant on March 14, 2014, over two months after the claimant's date last insured in December 2013.  The Court finds no error in the ALJ's decision to give only "some weight" to Dr. Lorensen's opinion. The regulations set forth six factors for evaluating medical opinions, including those by consultative examiners: (1) examining relationship; (2) treatment relationship, including the length, nature, and extent of the relationship; (3) supportability, particularly medical signs and laboratory findings; (4) consistency; (5) specialization; and (6) other factors that may support or contradict the opinion. 20 C.F.R. § 416.927(c).

Dr. Lorensen was a consulting examiner who did not treat the claimant. (R. 592). The ALJ specifically rejected Dr. Lorensen's conclusion that the claimant had "moderate-to-marked restrictions . . . reaching." (R. 26, 595). The ALJ explained that Dr. Lorensen's findings on physical examination would not support such a conclusion. (R. 26). Dr. Lorensen stated that the

---

[12] There is no argument that the ALJ failed in his duty to develop the record. *See* 20 C.F.R. § 404.1512(b) ("Before we make a determination that you are not disabled, we will develop your complete medical history.").

claimant's strength was "5/5 in the upper and lower extremities," that there was "[n]o cyanosis, clubbing, or edema" or "muscle atrophy," that his hand and finger dexterity was intact, and that his grip strength was "5/5 bilaterally." (R. 592). In addition, as the ALJ noted, Dr. Lorensen found that the claimant's cervical spine showed "full flexion, extension, lateral flexion bilaterally and full rotary movement bilaterally," and had full range of motion of shoulders, elbows, forearms, wrists, hips, and ankles bilaterally. (R. 26, 591).

Although Dr. Lorensen found the claimant's lumbar spine flexion was "50 degrees," extension was "20 degrees," and lateral flexion and extension were "15 degrees," given the other findings, all of which were normal, and in light of the record as a whole, the Court concludes that the ALJ's decision to discount Dr. Lorensen's conclusion that the claimant's ability to reach was impaired was supported by substantial evidence. *See Ortiz v. Comm'r of Soc. Sec.*, 309 F. Supp. 3d 189, at 204 (S.D.N.Y. 2018) (finding that the ALJ properly applied regulations in assigning "only 'some weight'" to the opinion of the consulting examiner where it was not consistent "with the record as a whole," which was "a factor contained in 20 C.F.R. § 404.1527(c)"); *cf.* 20 C.F.R. § 404.1527(c) ("[T]he more a medical source presents relevant evidence to support a medical opinion, particularly medical signs and laboratory findings, the more weight we will give that medical opinion.").[13]

---

[13] Plaintiff also asserts, without additional analysis or argument, that the ALJ failed to "fully discuss [Dr. Lorensen's] opined moderate-to-marked restrictions in bending and lifting." (Dkt. No. 9, at 11). The ALJ, however, appears to have given weight to these aspects of Dr. Lorensen's opinion because he found that the claimant "should no more than occasionally stoop" or "crouch" and was limited to lifting "20 lbs. occasionally and 10 lbs. frequently," (R. 22). Indeed, stopping and crouching are identified in Social Security policy materials as forms of bending. *See* SSR 83-14 (1983) (describing "[t]wo types of bending": "stooping (bending the body downward and forward by bending the spine at the waist);" and "crouching (bending the body downward and forward by bending both the legs and spine)"). Further, a moderate restriction of bending and lifting does not necessarily preclude the performance of light work, and on this record the ALJ's lifting restrictions were supported by substantial evidence. *See, e.g., Campbell v. Colvin*, No. 14-cv-5385, 2015 WL 5311239, at *11, 2015 U.S. Dist. LEXIS 121758, at *32 (S.D.N.Y. Sept. 11, 2015) ("The only limitation reflected in Dr. Johnston's report is a 'moderate restriction of bending and lifting' which would not preclude performance of light work."); *Duran v. Colvin*, No. 14-cv-4681, 2015 WL 4476165, at *14, 2015 U.S. Dist. LEXIS 95344, at *39 (S.D.N.Y. July 22, 2015) (finding claimant's "moderate

## 2. Reaching Limitation

Plaintiff argues that the RFC determination is not supported by substantial evidence because the ALJ "failed to account for [the claimant's] reaching limitations." (Dkt. No. 9, at 12). The Regulations define residual functional capacity as "the most [a claimant] can still do despite" her limitations. 20 C.F.R. § 404.1545 (a) (1). The ALJ must assess "the nature and extent of [a claimant's] physical limitations and then determine . . . residual functional capacity for work activity on a regular and continuing basis." 20 C.F.R. § 404.1545(b). The Regulations further state that "[a] limited ability to perform certain physical demands of work activity, such as sitting, standing, walking, lifting, carrying, pushing, pulling, or other physical functions (including manipulative or postural functions, such as reaching, handling, stooping or crouching), may reduce your ability to do past work and other work." *Id.* "Reaching is 'required in almost all jobs,' and a reaching limitation 'may eliminate a large number of occupations a person could otherwise do.'" *Selian v. Astrue*, 708 F.3d 409, 422 (2d Cir. 2013) (quoting SSR 85-15, 1985 WL 56857, at *7, 1985 SSR LEXIS 20, at *19 (Jan. 1, 1985)).

Here, the ALJ found that the claimant had the RFC "to perform light work . . . and can lift/carry 20 lbs. occasionally and 10lbs. frequently, sit for up to 6 hours and stand/walk up to 6 hours, except he should no more than occasionally stoop, balance, kneel, crawl and crouch, and should avoid . . . respiratory irritant[s] and should not work at unprotected heights or around dangerous machinery." (R. 22). In making this finding, the ALJ "considered all symptoms and the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence" but found that the claimant had no limitation in his ability to reach. (R. 23).

---

restriction for bending, lifting, pushing, pulling, squatting, and walking" did not preclude performance of the range of light work).

As discussed above, the limitations Drs. Slezka and Lorensen identified were not supported by the evidence in the record. The record shows that the claimant suffered from lumbar spine degenerative disc disease, lumbar radiculitis, noncardiac chest pain, and coronary artery disease, and that he was "status post inferior wall myocardial infarction with right coronary artery angioplasty and cardiac defibrillator implantation." (R. 19, 272, 394, 592, 927, 945). However, the physical examination findings regarding the claimant's head, neck, and extremities were consistently normal. (*See* R. 271 (noting on physical examination that the claimant's range of motion in his neck and upper and lower extremities was within normal limits); R. 382 (finding full range of motion in extremities); R. 452 (finding no "cyanosis, clubbing, or edema" of the extremities); R. 722 ("Back: symmetric, nor curvature. ROM normal."); R. 282 ("Neurological: alert, oriented, cranial nerves . . . intact, no neurological deficits, upper extremity: sensation to fine touch grossly intact bilaterally, lower extremity: sensation to fine touch grossly intact bilaterally, upper extremity: motor function grossly intact bilaterally, lower extremity: motor function grossly intact bilaterally, deep tendon reflexes 2+ in all four extremities, straight leg raise negative bilaterally, abnormal gait.")). Thus, the ALJ's determination that the claimant did not have a reaching limitation is supported by substantial evidence.

### 3.     Rule 201.12

Plaintiff argues that had the ALJ credited the opinions of the examining physicians, the claimant "would have been more appropriately limited to a range of sedentary work," and that given his age and "unskilled previous work experience," Rule 201.12 directs a finding of disabled. (R. 13). *See Miller v. Astrue*, No. 11-cv-4103, 2013 WL 789232, at *14, 2013 U.S. Dist. LEXIS 30129, at *37–38 (E.D.N.Y. Mar. 1, 2013) ("Pursuant to Medical Vocational Rule 201.12, a person who is closely approaching advanced age with a high school education and

unskilled previous work experience should be found disabled if he or she can perform only sedentary work." (citing 20 C.F.R. Part 404, Subpart P, App. 2)). Since the ALJ's RFC determination that the claimant could perform light work (during the relevant time period, May 15, 2010 to December 31, 2013) is supported by substantial evidence, the Court likewise concludes that the ALJ's finding that the claimant was not disabled—based on the testimony of the vocational expert that the claimant was capable of performing other work—is supported by substantial evidence.

## IV.    CONCLUSION

For these reasons it is

**ORDERED** that the decision of the Commissioner is **AFFIRMED**; and it is further

**ORDERED** that the Clerk close this case and provide a copy of this Memorandum-Decision and Order to the parties.

**IT IS SO ORDERED.**

Date:    September 12, 2018
         Syracuse, New York

Brenda K. Sannes
U.S. District Judge